# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
March 7, 2012 Session

## ANN CLAUDIA SHORT BOWERS v. FREDERICK ALLEN BOWERS

**Appeal from the Chancery Court for Knox County**
**No. 175929-2    Hon. Michael W. Moyers, Chancellor**

**No. E2011-00978-COA-R3-CV-FILED-MAY 17, 2012**

This post-divorce appeal concerns the classification and division of property, namely a house Wife owned prior to the marriage and a house purchased during the marriage. Following the grant of Wife's request for divorce, the trial court classified the pre-marital house as Wife's separate property and the house purchased during the marriage as marital property. The court ruled that Husband had dissipated the proceeds from the sale of the pre-marital house and ordered Husband to reimburse Wife. The court awarded Wife two-thirds of the equity in the marital house, leaving one-third of the equity to Husband. Husband appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. KELLY THOMAS, JR., Judge on the Court of Criminal Appeals sitting by special designation, joined.

Joshua H. Jenne, Cleveland, Tennessee, for the appellant, Frederick Allen Bowers.

L. Caesar Stair, III, Knoxville, Tennessee, for the appellee, Ann Claudia Short Bowers.

## OPINION

## I. BACKGROUND

Ann Claudia Short Bowers ("Wife") married Frederick Allen Bowers ("Husband") on April 7, 2001. This was Wife's second marriage and Husband's third. Husband had been

divorced twice, while Wife was widowed by her first husband, Robert R. Simpson. Wife entered the marriage to Husband with a daughter ("Katherine") and significant financial assets, including the home ("Loma Drive") that she shared with Mr. Simpson and Katherine. Likewise, Husband entered the marriage to Wife with a daughter ("Chelsea") and significant financial assets, including a Sea Ray yacht (the "Sea Ray") and property in Oklahoma. There were no children born of the marriage between Husband and Wife.

Husband, who had been residing in Oklahoma, brought Chelsea with him when he moved into Loma Drive with Wife and Katherine. At the time of the marriage, Wife was an attorney in Knoxville, Tennessee. Husband was retired and disabled but had been awarded a significant financial settlement in the amount of $900,000 from disability litigation. He used the settlement proceeds and proceeds from the sale of his Oklahoma property to trade stocks and currency on a daily basis.

Except for a joint account that was rarely used, the parties kept their finances separate. Each party had their own checking account and credit cards. Wife paid the mortgage and expenses relating to Loma Drive, while Husband made the payments for the Sea Ray. While the parties kept their finances separate, Husband funded a renovation of the basement of Loma Drive shortly after the marriage. In 2002, Husband suggested that they refinance Loma Drive in order to take advantage of lower interest rates. Wife agreed, and Husband contacted an acquaintance in Oklahoma that was able to secure the lowest rate. Wife continued to be the only party obligated on the loan, but Husband's name was added to the deed. Following the refinancing, Husband asked Wife to reimburse him for the amount he spent renovating the basement. Wife agreed.

In April 2005, Wife purchased a house ("Navigator Pointe"). Wife paid $125,552.14 as a down payment and financed $350,000 for the property.[1] Again, Husband was not liable for the mortgage but was added to the deed. Four months later, the parties sold Loma Drive and received a check for $172,114.96 as proceeds from the sale. The check was made payable to both parties. Wife instructed Husband to deposit the check. Husband deposited the check in his private checking account and never gave Wife any of the money.

The parties separated on August 16, 2009. Approximately two weeks later, Wife filed a complaint for divorce, alleging irreconcilable differences and inappropriate marital conduct. Husband denied that he had been guilty of inappropriate marital conduct and filed a counter-claim, alleging that the marriage was irretrievably broken because of irreconcilable

---

[1]The down payment was obtained from the proceeds of the sale of a condominium willed to her by Mr. Simpson's mother.

differences and that Wife was guilty of inappropriate marital conduct. Wife denied the allegation of inappropriate marital conduct.

At trial, Wife confirmed that she and Husband kept their finances completely separate. She explained that they never discussed finances because everything had always been separate. She recalled that Husband sold a house and an adjoining lot in Oklahoma while they were married. She was not involved in the Oklahoma transaction, and Husband placed the money in his investment account that he used for day trading. She was never given any of the money from that sale. She said that Husband moved into Loma Drive after they were married but that she continued to pay the mortgage and all of the expenses related to the property. When they refinanced the property, she paid off the first and second mortgages and established a new note. Husband was not obligated on the note but was added to the deed. She could not recall whether she objected to the addition of Husband's name on the deed. She said that two days after the closing Husband "demanded" that she wire the money obtained from the refinancing to Key Bank, which carried the debt on the Sea Ray. She explained that the money was "to cover what he had put into the house."

Wife stated that in 2005, Husband was unhappy and constantly complaining about Loma Drive, the railroad tracks near Loma Drive, and Knoxville in general. She "wanted to buy a little peace" and decided to purchase Navigator Pointe from her friend, Gay Stewart. She believed that Navigator Pointe would "be a good place" for her and Katherine. She also hoped that the breeze from the adjoining lake would help Husband's allergies, and she thought that the absence of railroad tracks would be "helpful" in general. She admitted that Chelsea would also live there and stated,

> I anticipated that this was my house that my daughter would be living in, that Chelsea would be staying in, which really didn't happen much, and that [Husband] would come and go from his boat or wherever it is he wanted to go.

She said that she negotiated the sale with Mrs. Stewart and that they understood the house was to belong to her and Katherine. She recalled that she made all of the mortgage payments and paid the taxes, insurance, and utilities for Navigator Pointe. She did not know why Navigator Pointe was jointly titled. She stated that she was not even sure that she saw the warranty deed at the closing.

Wife sold Loma Drive shortly after they moved into Navigator Pointe. She recalled that she and Husband were both present for the closing but that she had to leave quickly. When she received the check made payable to her and Husband, she endorsed it, handed it to Husband, and directed him to deposit the check. Later, she told Husband that she needed her money from the sale of Loma Drive. Husband told her not to bother him and that he

would "take care of it later." She had several other conversations about the money in which Husband told her that he would give her the money at a later time. She asserted that if she had intended to use the money for marital purposes, she "would have been in charge of keeping up with the records and doing it." She admitted that Husband had written her checks throughout the marriage but asserted that the checks were meant to reimburse her for medicine she sent to Husband when he was out of town.

Wife opined that she simply believed that the money from the sale of Loma Drive was sitting in his bank account. She admitted that his bank statements came to the house but said that she did not open his mail. She later found out that Husband spent all of the money in his account, including the proceeds from the sale of Loma Drive. She recalled that $56,748.42 of the money was spent on the boat and related expenses, $50,338.03 of the money was used to pay his credit cards, $57,153.07 of the money "went to some unknown creditor," and Husband wrote several checks to cash that totaled $10,800. His account was also used to pay other personal expenses but was never used to support her or Katherine.

Wife testified that the status of the marriage in 2005 was "very bad." She said that Husband left for Hawaii in September 2005 and spent very little time at Navigator Pointe after that. She claimed that after Christmas 2008, she "started planning to file for divorce" and that Husband moved out in August 2009 shortly before she finally filed for divorce.

Husband testified that when he moved to Loma Drive with Chelsea, the house was referred to as "our home." He said that Wife "wanted Chelsea and [him] to feel at home, and it was treated, regarded that way, and dealt with that way." He related that when they were first married, they decided that she would make the mortgage payments and that he would make the boat payments. He explained that "[i]t didn't make sense to either one of [them] for one of [them] to write the other one a check for a thousand dollars a month back and forth." He believed that the payments were always treated equally and said that they never fought about the finances. He recalled that he renovated the basement because he wanted to design a family space for Katherine and Chelsea.

Husband testified that they decided to refinance Loma Drive in order to take advantage of the lower interest rates. He explained that they used a broker in Oklahoma because that broker "came up with a lower interest rate than the folks that [they] talked to" in Tennessee. He stated that they both applied for a loan and that Wife "wanted the home deeded the way it was." He could not remember "much about" why Wife wired $38,000 to Key Bank following the refinancing of Loma Drive.

Husband admitted that he placed the proceeds from the sale of Loma Drive in his Bank of America account that was listed as his separate property following Wife's complaint

-4-

for divorce. He explained that the account had "been used for marital expenses for things that [they] had done throughout the marriage." He submitted five checks out of that account evidencing his payments for marital expenses. These checks reflected a payment of $85.05 for a veterinarian visit, $600 for tax preparation, $560.21 for Comcast cable, $2,779.00 for tax return changes, and $125 for cremating the family dog. He submitted four checks out of that account evidencing his payments for expenses relating to Navigator Pointe. These checks reflected a payment of $200 for Homeowner's Association dues, $195.00 for cleaning the carpet, a payment of $323.38 for refilling the propane tank, and a payment of $84 for servicing the air conditioner at Navigator Pointe. Husband stipulated that the account had a balance of $1,849 remaining prior to trial. He presented his transaction history for that account which reflected recurring deposits from his investment accounts and other sources. The history also reflected corresponding withdrawals for his use, the payment of car insurance for he and Wife, and two $1,000 checks to Wife.

Relative to Navigator Pointe, Husband recalled that he and Wife had told Mrs. Stewart and her husband, Bob, that they would like to buy the property if it ever went up for sale. He testified that he negotiated the price with the Stewarts and executed the sales contract. He recalled that he and Wife talked about buying Navigator Pointe as a home for their family. He related that they both applied for financing but that he did not sign the note because it was "less expensive to do it that way." He explained that they discussed the down payment and that Wife volunteered to make the down payment. He asserted that they even added each other to their respective life insurance policies because they wanted to ensure that the spouse that survived the other would be able to afford Navigator Pointe.[2]

Husband believed that when they purchased Navigator Pointe in 2005, he and Wife were "getting along well" and having fun together. He said that the problems with the marriage were "episodic." He admitted that he was absent from the home on several occasions. He recalled that he went to Hawaii on at least two separate occasions and that he lived in Las Vegas for several months. The first visit to Hawaii occurred in late 2005 when he spent "three or four months" there with his mom, who had a house in Hawaii. He recalled that Wife and Katherine visited him for Christmas and that he returned in January 2006. He went to Las Vegas for a week in July 2007 for a training seminar and returned for a job opportunity in October 2007. He remained in Las Vegas until April 2008. He returned to Hawaii at some point in 2008 and spent the summer there with Katherine.

Mrs. Stewart testified that she met Wife in 1985 and that they had a very close relationship throughout the years. She met Husband in 1994 or 1995. She stated that once

---

[2]Wife asserted that she added Husband to her policy because she wanted to forestall him from seeking an elective share of her estate if she were to die during the marriage.

Wife and Husband married, she saw them fairly frequently and also did some work for them at Loma Drive. She recalled that Husband complained about Loma Drive, asserting that the house smelled like it had mold or mildew and that he did not like being near the railroad tracks. Husband contracted her and Mr. Stewart to renovate the basement. As a result of that contract, she worked with Husband "on a day-to-day basis" renovating Loma Drive. She related that Husband told her that he wanted his mother to move into the basement and help with Chelsea. She said that Husband was upset when his mother got married and moved to Hawaii. She stated that Husband asked whether refinancing Loma Drive would allow him to recoup the money that he had spent renovating the basement.

Mrs. Stewart testified that she moved into Navigator Pointe in 2003. She said that when she decided to move to Crossville, Tennessee she thought Wife might be interested in Navigator Pointe. She explained that she thought Wife's marriage was in jeopardy and that her sister lived near Navigator Pointe and could be a source of support for Wife and Katherine. She also believed that if Wife and Husband were to stay together, Navigator Pointe could alleviate "some of those pressures" that Husband put on Wife because of his unhappiness with Loma Drive. She negotiated the sale with Wife, but Wife told her to meet with Husband to complete the paperwork. She admitted that Wife's name did not appear on the sales contract and that Husband's name was listed as the purchaser of Navigator Pointe. She explained that Wife was attending a function the day that she completed the contract with Husband. She recalled that once Wife and Husband moved into Navigator Pointe, Husband was "gone fairly often."

Following the presentation of the above evidence, the trial court granted the joint request for divorce based upon the stipulated ground of irreconcilable differences. As relevant to this case, the court declared that Loma Drive was Wife's separate property and that Husband had dissipated the proceeds from the sale of Loma Drive. The court awarded Wife a judgment against Husband in the amount of $88,289, reflecting the proceeds from the sale of Loma Drive less the credit that he was due from the division of the marital assets. The court further declared that Navigator Pointe was marital property, that Wife was entitled to two-thirds of the net equity value of the property, and that Husband was entitled to one-third of the net equity value of the property.

Relative to the finding that Loma Drive was Wife's separate property, the court acknowledged that "[Loma Drive] belonged to [Wife] when she came into the marriage" and that "when the house was refinanced it was, for reasons unknown, titled in [Husband's] name as well as [Wife's] name." The court held that the addition of Husband's name to the title raised "a rebuttable presumption in Tennessee that the house became marital property." The court found that the presumption was rebutted by

the fact that [Wife] continued to make all of the payments; she disclaimed any desire at any time for that to become a marital property; and the fact that when [Husband] invested some money into some renovations or improvements in the house, he demanded his investment be returned to him as part of the refinancing process.

The court concluded that the fact that the parties "scrupulously kept their finances separate" evidenced an "intent on both of the parties with regard to [Loma Drive], that [the] property would remain the separate asset of [Wife]." The court further found that the $172,114.96 from the sale of Loma Drive was also Wife's separate property and that the money had not been spent for marital purposes but had been "dissipated in some way." The court held that the money should be taken out of Husband's share of the marital estate and that Husband should repay the amount remaining.

Relative to the finding that Navigator Pointe was marital property, the court acknowledged that unlike Loma Drive, the property was acquired during the marriage and was jointly titled when it was purchased. The court said that "it was clear from the testimony that [Wife] saw [Navigator Pointe] as the families' home" and that Husband even signed the contract for purchase. The court held that based upon the totality of the circumstances, it was "not convinced" that the presumption that Navigator Pointe was marital property had been overcome even though Wife made the down payment using her separate property. In dividing the property, the court found that Wife had "shouldered the burden of acquiring, maintaining, and preserving the asset" and that an "equitable distribution of the marital equity would be two-thirds to [Wife] and one-third to [Husband]."

## II. ISSUES

We consolidate and restate the issues raised by the parties on appeal as follows:

A. Whether the court erred in classifying Loma Drive as separate property and Navigator Pointe as marital property and dividing the equity in Navigator Pointe.

B. Whether the court erred in imposing a judgment upon Husband for the proceeds from the sale of Loma Drive.

C. Whether Wife is entitled to attorney fees and costs on appeal.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

The trial court's classification and division of property is reviewed de novo with a presumption that the trial court's factual findings are correct. *See Watters v. Watters*, 959 S.W.2d 585, 588 (Tenn. Ct. App. 1997). Absent an error of law, the court's classification and subsequent division of property will be reversed or modified only if the evidence preponderates against the court's decision. *Id.* The trial court has wide discretion in classifying and dividing property. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). This court must give great weight to the trial court's decisions in dividing marital assets, and "'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).

## IV. DISCUSSION

### A.

#### 1. Loma Drive

Husband contends that the trial court improperly classified Loma Drive as separate property when Loma Drive was transmuted into marital property. He asserts that he invested in the property, that they decided to refinance to secure lower payments for the family, that he also applied for a loan when they sought to refinance, and that Wife even added him to her life insurance policy to ensure that he could pay off the mortgage if she were to die. Wife responds that Loma Drive was properly classified as separate property.

Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate or marital property before dividing the marital estate. *See generally* Tenn. Code Ann. § 36-4-121(a)(1); *see Snodgrass*

*v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009). Separate property is not part of the marital estate and is therefore not subject to division. *See Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). Separate property is defined as,

> (A) All real and personal property owned by a spouse before marriage, including, but not limited to, assets held in individual retirement accounts (IRAs) as that term is defined in the Internal Revenue Code of 1986 as amended;
>
> (B) Property acquired in exchange for property acquired before marriage except when characterized as marital property under subdivision (b)(1);
>
> (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1);
>
> (D) Property acquired by a spouse at any time by gift, bequest, devise or descent;
>
> (E) Pain and suffering awards, victim of crime compensation awards, future medical expenses, and future lost wages; and
>
> (F) Property acquired by a spouse after an order of legal separation where the court has made a final disposition of property.

Tenn. Code Ann. § 36-4-121(b)(2). In contrast, "marital property includes all property owned as of the date of the filing of the complaint for divorce or acquired up to the date of the final divorce hearing." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 233 (Tenn. 2010); *see* Tenn. Code Ann. § 36-4-121(b)(1). Marital property also

> includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

Tenn. Code Ann. § 36-4-121(b)(1)(B). The classification of property as either marital or separate property is a question of fact for the trial court. *Mitts v. Mitts*, 39 S.W.3d 142, 144-45 (Tenn. Ct. App. 2000).

"[S]eparate property can become part of the marital estate due to the parties' treatment of the separate property." *Eldridge v. Eldridge*, 137 S.W.3d 1, 13 (Tenn. Ct. App. 2002). "The doctrines of transmutation and commingling provide an avenue where separate property can become marital property." *Id.* This court has stated that

> [transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. Ct. App. 1988) (internal citations and quotations omitted). Likewise, "[t]he related doctrine of commingling concerns instances where separate property becomes marital property when the separate property is inextricably mingled with marital property or the other spouse's separate property." *Eldridge*, 137 S.W.3d at 14 (citation omitted).

Loma Drive was owned by Wife prior to the marriage and was her separate property. We agree with the trial court that the addition of Husband's name to the deed created a rebuttable presumption that Wife gifted her separate property to the marital estate. However, we, like the trial court, cannot ignore the way in which these parties treated the obligations arising out of the care and maintenance of Loma Drive. Wife was the only party obligated on the mortgage and was the only party that paid the mortgage and other expenses related to the property. Additionally, Husband demanded to be reimbursed for his one-time investment in the property when he renovated the basement. In short, the parties evidenced a clear intent to keep Loma Drive as Wife's separate property. Accordingly, we conclude that the trial court did not err in classifying Loma Drive as Wife's separate property.

## 2. Navigator Pointe

Wife asserts that Navigator Pointe was improperly characterized as marital property. She argues that she acquired the property using her separate property and that she evidenced a clear intent that Navigator Pointe remain her separate property. In the alternative, she asserts that there was no basis for the trial court to award Husband any portion of the equity

in the property. Husband responds that the court properly characterized Navigator Pointe as marital property.

The parties bought Navigator Pointe while they were married, creating a rebuttable presumption that the property was marital property. While Wife paid the down payment with her separate property, Husband signed the sales contract as purchaser and was added to the deed. Husband also submitted some documentation evidencing his payment of expenses relating to the home, namely cleaning the carpets, refilling the propane tank, and paying one month of Homeowner's Association dues. We acknowledge that Husband's monetary contributions to the care and maintenance of Navigator Pointe were minor. However, the testimony presented at trial evidenced an intent that the property was to be jointly owned in hope of appeasing Husband's dislike with Loma Drive and Knoxville in general. Accordingly, we conclude that the trial court did not err in classifying Navigator Pointe as marital property.

Having determined that the property was properly classified as marital property, we must determine whether the court properly divided the equity in the property. Wife maintains that Husband was not entitled to any of the equity because he did not substantially contribute to the care and maintenance of the property. The Tennessee Code outlines the relevant factors that a court must consider when equitably dividing marital property without regard to fault on the part of either party. Tenn. Code Ann. § 36-4-121(a)(1), (c). An equitable division of marital property is not necessarily an equal division, and section 36-4-121(a)(1) only requires an equitable division. *See Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002). Taking into consideration Husband's participation in the purchase of Navigator Pointe, his limited contributions to the marriage in general, and his care and maintenance of Navigator Pointe, we conclude that the trial court did not err in dividing the equity in Navigator Pointe.

B.

Husband asserts that Wife was not entitled to a judgment against him for the Loma Drive proceeds because the money became marital property when it was commingled with the money in his bank account. He also contends that the trial court erred in awarding Wife a judgment for money that no longer existed. Wife responds that the evidence presented demonstrated that Husband unlawfully dissipated the proceeds.

We reject Husband's assertion that the money became marital property because it was placed in his bank account and commingled with his money that he used for his enjoyment and various marital expenses. The testimony at trial reflected that the parties kept their finances separate and that each party had their own checking account. The fact that Husband

-11-

had been reimbursed for his contribution to Loma Drive is also of particular importance. The testimony evidenced a clear intent that Wife viewed the property as hers and that Husband wanted nothing to do with expenses related to Loma Drive. We do not believe that the money obtained from the sale of the property should be viewed any differently. Moreover, Wife repeatedly asked Husband to return the money, evidencing her intent that the money remain her separate property and that the money not be used for the marriage or for Husband's enjoyment. Accordingly, we conclude that the trial court did not err in determining that the money remained Wife's separate property even after it was placed in Husband's checking account.

We also reject Husband's assertion that he need not return the money because he spent it. In support of his position, Husband cites *Brock v. Brock*, 941 S.W.2d 896 (Tenn. Ct. App. 1996) and *Flannary v. Flannary*, 121 S.W.3d 647 (Tenn. 2003). In *Brock*, this court stated,

> [P]roperty once owned by a spouse, either as separate property or marital property, but not owned by either spouse at the time of the divorce, is not subject to classification and division or distribution when the divorce is pronounced. This is because, generally speaking, a court cannot divide and/or distribute what is "not there" – property no longer owned by the parties, individually or jointly, at the time of the divorce.

941 S.W.2d at 900 (footnote omitted). The court held that the property assets sought by husband had been "merged into the 'wealth' of the marriage" and no longer existed in their original form. *Id.* at 901. The court found that his contribution could be considered in the equitable division of the overall estate but that he was not entitled to a "dollar-for-dollar credit" for the value of his separate property that had been immersed into the wealth of the marriage. *Id.* In *Flannary*, husband placed $48,000 in his dresser drawer. 121 S.W.2d at 649. When he went to retrieve the money, he discovered that it was missing. *Id.* The trial court awarded wife a judgment against husband for $24,000, representing half of the money that he misplaced. *Id.* Following this court's reversal of the judgment, the Tennessee Supreme Court stated,

> Under the definition found at Tennessee Code Annotated section 36-4-121(b)(1)(A), the missing funds are not "marital property" that is subject to division. It is undisputed that the money was missing before [h]usband filed for divorce, and both parties testified that the money was not in their possession. Furthermore, the trial court concluded that anything could have happened to the money and stated that "neither one of [the parties] knows what happened to it." Thus, it appears from the record that the property was not owned by either of the parties as of the date the complaint for divorce was

-12-

filed. Accordingly, this property does not fit within the definition of "marital property" and should not have been divided as part of the marital estate.

*Id.* at 650 (citations omitted). The Court ultimately held that while the funds were not marital property, it could consider husband's mishandling of the funds in distributing the remaining property that constituted marital property. *Id.* at 651.

Following our review, we conclude that this case is factually distinct from the circumstances presented in *Brock* and *Flannary*. Here, Husband presented documentation of his limited contributions to the marriage following his deposit of the proceeds from the sale of Loma Drive. The testimony presented reflected that Husband carried a continually revolving balance in that account and that the account had dwindled down to less than $2,000 prior to trial. These proceeds were not immersed into the wealth of the marriage but were unlawfully retained and eventually spent by Husband over Wife's objection. Additionally, these proceeds were never considered marital property. Given the circumstances presented in this case, the money remained Wife's separate property and was not subject to division. Husband should be held accountable for the unlawful expenditure of money that did not belong to him.

Furthermore, we believe that his expenditure of the money despite Wife's continued request for its return amounted to a dissipation of Wife's separate property. *See Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005) ("The concept of dissipation is based on waste."). The Tennessee Code provides that when equitably distributing *marital* property, the court shall consider

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

Tenn. Code Ann. § 36-4-121(c)(5)(A), (B). The court is tasked with adjusting the division of the *marital* property when attempting to remedy a party's unlawful dissipation of marital property. However, the remedy is less clear when a party has dissipated a spouse's separate

property. Here, the proceeds were not marital property but were Wife's separate property that was not subject to division. Following our review, we conclude that the trial court did not err in imposing a judgment upon Husband for the money, less the amount that he was entitled from the division of the actual marital estate.

## C.

Wife asserts that Husband's appeal was frivolous and that she is entitled to damages in the form of attorney fees and costs for having to defend against the appeal. Tennessee Code Annotated section 27-1-122 provides for an award of damages, including attorney fees, when an appeal is determined to be frivolous. To find an appeal frivolous, the appeal must be wholly without merit and lacking in justiciable issues. *See Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Indus. Dev. Bd. of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). An appellate court's decision on this issue is discretionary, and this court is generally reluctant to award such damages because we do not want to discourage legitimate appeals. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006). Following our review, we respectfully deny Wife's request for attorney fees on appeal because we do not believe the appeal was wholly without merit and lacking in justiciable issues.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Frederick Allen Bowers.

_____
JOHN W. McCLARTY, JUDGE

-14-